IVERSON and another, Respondents, vs. SCHNACK, Appellant.

*February 3—March 3, 1953.*

For the appellant there was a brief by *Willis E. Donley,* and oral argument by *Mr. Donley* and *Mr. Robert F. Muza,* both of Menomonie.

For the respondents there was a brief by *Doar & Knowles* of New Richmond, and oral argument by *John Doar* and *W. T. Doar, Jr.*

MARTIN, J.   Appellant Harold Schnack was the owner of a Marshall-Wells hardware store in Amery, Wisconsin, and sometime prior to November 22, 1950, had asked Mr. Henry Meline, supervisor of the Marshall-Wells Company, to assist in procuring a buyer for the store.   Respondent Lloyd Iverson, through a relative, heard that the store was for sale and contacted Mr. Meline.   On November 21 and 22, 1950, the parties discussed the matter and entered into the following contract:

"This agreement made this 22d day of November, 1950, by and between Harold Schnack, first party, and Lloyd Iverson and Eileen Iverson, his wife, second parties.

"It is hereby agreed that the second parties are to purchase the hardware business and stock from the first party including the fixtures, tools, equipment, and truck, in accordance with list thereof furnished by first party to second parties, for the sum of $4,000, said money to be a down payment on the purchase price.   It is further agreed that the stock of the hardware business is to be sold at the inventory price as of February 15, 1951, plus 5 per cent to cover freight and delivery charges.   A representative of the Marshall-Wells Hardware Company is to make the inventory.   Delivery of the stock is to be made February 15, 1951, and payment is to be made for the same on that date.

"This agreement is subject to and contingent on the second parties securing a lease of the Heebink store property, now occupied by first party, for a term of four years from Feb-

ruary 15, 1951, at a rent of not more than $140 per month. In case the second parties are unable to secure said lease as aforesaid, first party agrees to refund the $4,000 paid for the fixtures, tools, equipment, and truck, and to take the same back.

"Seller agrees not to engage in the hardware business within 20 miles of Amery, Wisconsin, for a period of fifteen years from date hereof.

"In witness whereof, the parties have set their signatures this 22d day of November, 1950."

During the negotiations prior to signing the agreement, according to Iverson, Schnack said that the inventory of the store would run in the neighborhood of $25,000, but that Mr. Meline, hearing the conversation, took Iverson aside and told him, "Don't be afraid. After the obsolete items are discounted, and so on, it won't run over $20,000 to $22,000. I know this store and I know the inventory; I knew how much Schnack paid for that." There is no doubt that Mr. Meline was the representative of Marshall-Wells who was to make the inventory, but he never did so. After Schnack took an inventory for his annual records, he informed Iverson that it amounted to $28,800.

On February 19, 1951, respondents were advised in a letter from appellant's counsel:

"As you have failed to comply with the terms of said written agreement, wherein and whereby you agreed to take the inventory and pay the balance of the purchase price by the 15th day of February, 1951, we are formally notifying you of the termination of said contract, and that we are exercising our right to retain the initial payment made at the time of the execution of said contract."

For the purposes of this opinion we could assume that appellant is correct in his contentions that Mr. Meline was not the agent of the appellant and that there was no fraud or misrepresentation of material facts by the appellant in the

negotiations leading to execution of the agreement. However, appellant has proved no damages.

It was alleged in the counterclaim that appellant had suffered the loss of business and profits by reason of the failure of respondents to purchase the business. The only evidence in the record respecting his damages, however, is the testimony of Mr. Meline in response to a question whether there was any damage sustained by the execution of the contract:

"*A*. Yes, there was some damage.
"*Q*. Now, can you compute the amount of damages resulting from it? Answer that 'Yes' or 'No.' *A*. No.
"*Q*. Why not? *A*. Because it would be entirely speculation. There is no possible way of determining the exact amount of the damage."

Appellant cites *Knapp v. Davidson* (1923), 179 Wis. 493, 192 N. W. 75, quoting from *Hansbrough v. Peck,* 72 U. S. (5 Wall.) 497, to support his contention that one who has advanced money in part performance of an agreement and then refuses to fulfil such agreement will not be permitted to recover what has been advanced; but the case is not in point, since the subject matter there is real estate. The instant case is governed by the provisions of sec. 121.64 (3), Stats., the Uniform Sales Act, which applies to the sale of goods:

"Where there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances, showing proximate damage of a greater amount, the difference between the contract price and market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept."

Actions for damages under this section include counterclaims (sec. 121.76 (1), Stats.).

*By the Court.*—Judgment affirmed.

FAIRCHILD, J., took no part.